1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
10

11   RODNEY GOLDSON,                          Case No.  13-0403 WHO (PR)
                    Plaintiff,
12                                            **ORDER GRANTING DEFENDANT'S**
        v.                                    **MOTION FOR SUMMARY**
13                                            **JUDGMENT**

14   CLARENE DAVID,
15                    Defendant.
16

17

18                           **INTRODUCTION**

19          Plaintiff Rodney Goldson suffered from pain that limited mobility in his arm and

20   shoulder while incarcerated at San Quentin State Prison ("SQSP").  He asserts that a

21   physician at SQSP, defendant Clarene David, was deliberately indifferent to his medical

22   needs in violation of the Eighth Amendment as shown by her failure to investigate and

23   treat his condition adequately, the disagreement of other physicians and physical therapists

24   with her course of treatment, her disrespectful attitude and the similar complaints of other

25   inmates about her.[1]  I am asked on David's motion for summary judgment whether

26   Goldson has raised any material factual dispute so that the case should proceed to trial.  In

27

28   _____
     [1] Goldson's amended complaint, (Docket No. 5), is the operative complaint in this action.

United States District Court
Northern District of California

order to establish a deliberate indifference claim, Goldson's burden is to show that David's course of treatment was "medically unacceptable under the circumstances" and that it was embarked on "with conscious disregard of an excessive risk to plaintiff's health," *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004).  Goldson has not met that difficult burden.  Accordingly, I GRANT David's motion.

## BACKGROUND

David first saw Goldson on February 14, 2012, for a chronic care follow-up visit regarding multiple medical issues relating to his HIV diagnosis as well as his complaints of chronic joint pain in his shoulders, hips, knees and ankles.  (David Decl. ¶ 7.)  Goldson had Vitamin D deficiency, which may or may not have been contributing to his joint aches and pains.  (*Id.*, Ex. A at 008.)  David observed Goldson that morning and he appeared to be moving "quite freely with no guarding, limping, grimacing or signs of joint stiffness." (*Id*. at 009.)  Goldson was instructed to return in 4-6 weeks for a recheck of his complaints of joint pain.  (*Id*.)  Goldson alleges that during this visit he requested an X-ray and that during this and subsequent visits, David was disrespectful and "apathetic" concerning his medical needs.   (Opp., Ex. A at 3.)

On March 14, 2012, Goldson saw David with a chief complaint of left shoulder pain that began after an altercation in 2010.  (David Decl. ¶ 8, Ex. A at 014.)  Goldson had received a cortisone injection on October 12, 2011, which was wearing off.  (*Id.*)  David believed the pain was likely due to chronic bursitis; she referred Goldson for another joint injection and physical therapy once the pain was better controlled.  (*Id.*)  X-rays of his hip were also ordered to look into his nonspecific complaints of hip pain.  (*Id*.)  Based on her physical examination, David determined that Goldson was functionally active.  (*Id*. at 015.)  According to Goldson, he requested an X-ray, MRI and referral to an orthopedic specialist to determine the seriousness of his condition, *i.e.*, the constant pain and limited mobility in his arm and shoulder, but David denied the requests, stating that Goldson was still young and that he would have to live with his problem.  (Am. Compl. at 3.)

2

Goldson saw David next on April 27, 2012, on referral from the RN Triage Line. (David Decl. ¶ 9, Ex. A at 034.)  He had received a cortisone injection to his left shoulder on March 29, 2012, by Dr. John Grant.  (*Id.*, Ex. A at 023.)  According to David, Goldson reported that the injection helped with his range of motion in his shoulder but did not help the pain.  (David Decl. ¶ 9.)  David referred Goldson to physical therapy, but did not believe an MRI was warranted; Goldson did not have any serious signs or symptoms of impingement, had some improvement with his range of motion and got some pain relief with nonsteroidal medicine.  (*Id.*)  She stated that if physical therapy did not prove successful, she would consider an orthopedic evaluation.  (*Id.*)  According to Goldson, when he told David that his condition had worsened, his mobility was extremely limited, and again requested an X-ray, MRI and referral to a specialist, she responded by laughing and stating that Goldson did not need surgery.  (Am. Compl. at 3.)  Goldson asserts that David repeated her opinion that Goldson was young and could live with the condition.  (*Id.*)

Goldson saw David again on May 9, 2012 and June 5, 2012.  (David Decl. ¶¶ 10-11.)  At the first appointment, he complained of "energy crashes" occurring 1-2 times a week.  (*Id.*)  Goldson was given nutritional counseling and lab tests were ordered.  (*Id.*)  At the second visit, the results of the lab tests were discussed and he was treated for a rash in his groin.  (*Id.*)  According to Goldson, he mentioned his shoulder pain and lack of improvement with physical therapy at the second visit, but David again denied his requests for an X-ray and MRI.  (Opp. at 3.)

David saw Goldson next on July 16, 2012, on referral from Physical Therapy requesting an MRI before continuing treatment.  (David Decl. ¶ 12, Ex. A. at 060.)  According to Goldson, his physical therapist Richard Spriggs expressed frustration at the doctor's failure to order an MRI.  (Opp. at 3-4, Ex. D.)  David believed that Goldson's chronic left shoulder pain was mainly due to bicep tendonitis, but she ordered an MRI as requested.  (David Decl. ¶ 12.)

The MRI was done on July 23, 2012, and reviewed with Goldson on July 31, 2012,

1    by Dr. Shannon Garrigan.  (David Decl. ¶ 13, Ex. A at 069.)  The MRI showed the

2    following: no evidence of rotator cuff tear, some suggestion of minimal tendinosis at the

3    distal supraspinatus tendon, minimal subacromial impingement and some minor inferiorly

4    directed marginal acromioclavicular para-articular oseophytes.  (*Id.*)  Dr. Garrigan

5    believed it was possible that Goldson would benefit from an orthopedic consultation but

6    deferred the decision to David.  (*Id.*)

7         On August 10, 2012, Goldson saw Dr. Davy Wu for chronic shoulder pain and

8    stiffness, which was unimproved despite physical therapy and steroid injections.  (David

9    Decl. ¶ 14, Ex. A at 078.)  Dr. Wu's notes state that the MRI was "unimpressive" as it

10   showed only some minor abnormalities.  (Opp., Ex. F.)  Dr. Wu noted that Goldson had

11   depression so he opined whether some of the shoulder complaint is psychosomatic.  (*Id.*)

12   Dr. Wu nevertheless referred Goldson for an orthopedic consultation as "MRI is not

13   perfect."  (*Id.*)

14        Goldson saw Dr. Joseph Matan on August 20, 2012, who referred him to Dr.

15   William Lyon, an expert in should arthroscopic surgery.  (David Decl. ¶ 15, Ex. A at 082.)

16   An X-ray of the left shoulder was taken which showed a small dystrophic calcification

17   superior to the distalclavicular head, compativle with an old capsular injury.  There was no

18   acromioclavicular joint widening and no evidence of osteoarthritis.  (*Id.*)  Dr. Lyon was to

19   see Goldson in three days.  (*Id.*)

20        The next day on August 21, 2012, David saw Goldson for a follow-up from the

21   specialty clinic.  (David Decl. ¶ 16, Ex. A at 090.)  David was waiting for Dr. Lyon's

22   consultation and recommendation which she received on August 30, 2012; his plan was to

23   manipulate the left shoulder under anesthesia and then do an arthroscopic debridement.

24   David requested authorization for this procedure on August 31, 2012.  (*Id.*)

25        On September 7, 2012, David's request for manipulation and arthroscopic

26   debridement by Dr. Lyon was denied by the Utilization Management department.  The

27   decision noted that physical therapy was started in May 2012, and that a full year of

28   physical therapy is recommended prior to surgical intervention.  It was also noted that

United States District Court
Northern District of California

4

1   Goldson had responded to steroid injection which should be continued.  (David Decl. ¶

2   17.)

3          David saw Goldson next on September 19, 2012, for multiple medical issues

4   including his chronic left shoulder pain.  She reviewed with him the decision of the

5   Utilization Management department that Goldson should receive physical therapy for a full

6   year before Dr. Lyon's recommended procedure would be authorized.  David made a note

7   to discuss Goldson's case with Dr. Pratt, Chief Physician and Surgeon, and with Physical

8   Therapy to see if Goldson could have some improvement with continued physical therapy.

9   (David Decl. ¶ 18, Ex. A at 104-105.)

10         The next visit with David was on October 3, 2012, for follow-up regarding his

11  previous complaints.  Goldson wanted to proceed with Dr. Lyon's recommended

12  procedure.  David decided to refer him to Physical Medicine and Rehabilitation for formal

13  evaluation to see if there were any other exercises that Goldson could start doing to help

14  improve the range of motion in his left shoulder.  She also mentioned increasing his pain

15  medication to cover what could be a very painful exercise program.  (David Decl. ¶ 19, Ex.

16  A at 110.)

17         Thereafter, David saw Goldson for his chronic left shoulder pain and other medical

18  issues on October 24, 2012, December 7, 2012, and January 3, 2013.  At the last visit,

19  David informed Goldson that Physical Medicine and Rehabilitation did not think it had

20  anything to add to his treatment, and Physical Therapy thought he had reached maximum

21  improvement with physical therapy.  Goldson indicated that he wanted surgery.  David

22  therefore filed a request for another orthopedic consultation which was approved on

23  January 4, 2013.  (David Decl. ¶ 20, Ex. A at 136, 143-144.)

24         According to Goldson, Dr. Matan examined him on February 4, 2013, and

25  concluded the following: "Due to the denial and delay of X-ray and MRI, and finally the

26  denial of orthoscopic surgery, patient has lost significant range of motion, and as a result

27  of such, patient condition continues to decline."  (Am. Compl. at 4.)  There is no

28  documentation of such an opinion in Goldson's medical records.  Accordingly, it is

United States District Court
Northern District of California

1 | hearsay.  Goldson alleges that Dr. Matan resubmitted the request for surgery.  (*Id.*)

2 | Goldson received surgery on March 15, 2013, at Doctors Medical Center under Dr.

3 | Lyon.  David saw Goldson again on April 3, 2013, at which time he reported his shoulder

4 | was doing well with good range of motion but that he still had some residual pain.  He was

5 | encouraged to keep his follow-up orthopedic appointment as scheduled. (David Decl. ¶ 21,

6 | Ex. A at 213.)

7 | Goldson claims that David's failure to order an MRI from February 2012 to June

8 | 2012 amounted to deliberate indifference to his serious medical needs because she knew of

9 | his suffering and the risk of further serious harm when she refused to treat him.  (*Id.* at 5.)

10 | David asserts that she is entitled to summary judgment because her involvement in

11 | Goldson's care did not amount to deliberate indifference to any serious medical need he

12 | had.  (Docket No. 11 at 1.)

13 |

14 | **DISCUSSION**

15 | A.   **Standard of Review**

16 | Summary judgment is proper where the pleadings, discovery and affidavits

17 | demonstrate that there is "no genuine dispute as to any material fact and [that] the movant

18 | is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those

19 | which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

20 | 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

21 | reasonable jury to return a verdict for the nonmoving party.  *Id.*

22 | The party moving for summary judgment bears the initial burden of identifying

23 | those portions of the pleadings, discovery and affidavits which demonstrate the absence of

24 | a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

25 | Where the moving party will have the burden of proof on an issue at trial, it must

26 | affirmatively demonstrate that no reasonable trier of fact could find other than for the

27 | moving party.  On an issue for which the opposing party by contrast will have the burden

28 | of proof at trial, as is the case here, the moving party need only point out "that there is an

6

absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

B.   **Analysis**

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical needs and the nature of the defendant's response to those needs. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *See McGuckin*, 974 F.2d at 1060.

In order to prevail on a claim of deliberate indifference to medical needs, a plaintiff

must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [plaintiff's] health." *See Toguchi*, 391 F.3d at 1058-60.  A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, *see Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

The evidence presented does not show a genuine dispute as to any material fact relating to Goldson's claim of deliberate indifference against David for allegedly failing to grant his specific requests from February 2012 to June 2012.   David first saw Goldson in February 2012 for follow-up care.  Goldson asserts for the first time in opposition that he told David that he needed an X-ray during the visit, but that she denied the request.  (Opp. at 2.)  However, the notes from the visit make no mention of such a request.  (*Id.*, Ex. A.) Denial of the request, assuming it was made, is not evidence of deliberate indifference, particularly since David observed that Goldson appeared to be moving "quite freely with no guarding, limping, grimacing or signs of joint stiffness." *See supra* at 2.

When Goldson complained of left shoulder pain during the March 14, 2012 visit, David did not ignore his complaints but diagnosed the problem as possible chronic bursitis and prescribed a cortisone injection and physical therapy; she noted he remained functionally active and prescribed Tylenol in addition to other medication already

8

United States District Court
Northern District of California

prescribed to treat his complaints of pain.  *See supra* at 2; (David Decl., Ex. A at 015.)
Then in April 2012, David noted that the injection had helped Goldson's mobility and
referred him to physical therapy.  (*Id.*, Ex. A at 034.)  She did not believe that an MRI was
warranted because the injection was providing some relief and because Goldson did not
have any serious signs or symptoms of impingement.  (*Id.*)  She also noted that the pain
was not really in the shoulder joint itself, and that it may be due to biceps tendinitis or
deltoid tendinitis.  (*Id.*)  If a prison official should have been aware of the risk, but was not,
then the official has not violated the Eighth Amendment, no matter how severe the risk.
*Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).  The notes from the
exam indicate that David was not aware of any potential risk to Goldson if she did not
order an MRI, and her decision to refer him to physical therapy instead appears reasonable.
*Id.*

While Goldson was receiving physical therapy for his shoulder, David continued to
treat his other complaints, including a visit on May 9, 2012, for "energy crashes"; she
prescribed nutritional counseling and ordered lab tests.  *See supra* at 3.  Goldson's chronic
joint pain was noted with no mention of a request for MRI or other treatment.  (David
Decl., Ex. A at 039.)  Then on June 5, 2012, they briefly discussed his shoulder pain, and
Goldson stated that he was doing his exercises and that although his condition was not
much better, it was "not worse."  (*Id.* at 054.)  Finally, during the July 16, 2012 visit,
David noted that Physical Therapy had requested an MRI on June 7, 2012, within six to
eight weeks, but that she had never received an email regarding the request.  (*Id.* at 060.)
She ordered the MRI even though she did not believe it was necessary because Physical
Therapy stated that they would discontinue therapy otherwise.  (*Id.*)

Even though it appears Physical Therapy and David were at odds with Goldson's
course of treatment, a difference of medical opinion as to the need to pursue one course of
treatment over another is insufficient, as a matter of law, to establish deliberate
indifference, *see Toguchi*, 391 F.3d at 1058, 1059-60.  Goldson has failed to show that
David's chosen course of treatment was medically unacceptable under the circumstances

1   and that she chose this course in conscious disregard of an excessive risk to Goldson's

2   health.  *Id.* at 1058.  Rather, David kept open the possibility that an orthopedic consultation

3   may become appropriate if physical therapy appeared not be working, which indeed

4   became the case.  (Opp., Ex. C.)

5        Goldson points to the opinions of Dr. Garrigan and Dr. Matan as evidence that

6   David was remiss for not making the referral sooner.  However, even Dr. Garrigan's

7   opinion stated that she would "defer decision in regard to Orthopaedic referral to primary

8   care physician, David, as she knows this patient better than I and the history."  (Opp., Ex.

9   E.)  Dr. Matan indicated in his notes that he agreed with Goldson's physical therapist that

10  he "would benefit from arthroscopic surgery," and "[t]he patient noted that he had been

11  trying to get orthopedic consultation for the last six months and in my opinion of course,

12  such a consult is absolutely appropriate."  (*Id.*, Ex. G.)  Dr. Matan's statement

13  demonstrates a difference of opinion, not deliberate indifference.  *See Toguchi*, 391 F.3d at

14  1058, 1059-60.  Furthermore, although Dr. Matan's opinion indicates that an orthopedic

15  consultation was appropriate in August 2012, it does not address the appropriateness of

16  David's course of treatment from February 2012 to June 2012.

17       That same month, Dr. Wu presented an opinion with a different view from Dr.

18  Matan's.  He opined from his August 10, 2012 examination of Goldson that the MRI was

19  "unimpressive" and showed only some minor abnormalities.  (Opp., Ex. F.)  Dr. Wu also

20  noted Goldson's depression may be the psychosomatic cause of the shoulder complaints.

21  (*Id.*)  It is also significant that the Utilization Management Department denied David's

22  request on August 31, 2012, for manipulation arthroscopic debridement because a full year

23  of physical therapy was needed before surgical intervention.  *See supra* at 4.  This both

24  support's David's prior course of treatment and indicates that the different course of

25  treatment sought by Goldson, including an X-ray, MRI and orthopedic consultation as

26  early as February 2012, would not have been approved.  David's chosen course of

27  treatment was not unreasonable or medically unacceptable.

28       Goldson complains that David's attitude towards him and other patients was rude

United States District Court
Northern District of California

and disrespectful and that her course of treatment failed to address his and others' serious medical needs.  (*See* Declarations of Plunk, Bowen, Lewis, Young, Lamar, Maddoxx and Holmes, Opp. Attach.)  The complaints of other inmates are not relevant to this motion. What matters is not whether David's attitude was rude and disrespectful, but whether her course of treatment was "medically unacceptable" "in conscious disregard of an excessive risk" to Goldson's health.  *Toguchi*, 391 F.3d at 1058-60.  The record does not support such an inference.

Based on the evidence presented, there is no genuine issue of material fact that David chose a course of treatment in conscious disregard of an excessive risk to Goldson's health by denying his specific requests from February 2012 to June 2012.  Goldson has not shown a genuine dispute as to any material fact regarding his claim that David acted with deliberate indifference during the time period at issue.  Accordingly, the motion for summary judgment is GRANTED.

# CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (Docket No. 11) is GRANTED in favor of David.  Goldson's motion to continue the matter, (Docket No. 15), is DENIED as moot by this order.

The Clerk shall terminate Docket Nos. 11 and 15, enter judgment in favor defendant, and close the file.

**IT IS SO ORDERED.**

**Dated:**  March 18, 2014

_____
WILLIAM H. ORRICK
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


RODNEY W.GOLDSON,

              Plaintiff,

  v.

DR. CLARENE DAVID et al,

              Defendant.

_____/

Case Number: CV13-00403 WHO

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 18, 2014, I SERVED a true and correct copy of the attached, by placing said copy in a postage paid envelope addressed to the person hereinafter listed, by depositing said envelope in the U.S. Mail.


Rodney Goldson AI2938
San Quenting State Prison 4-H-14L
San Quentin, CA 94974


Dated: March 18, 2014

Richard W. Wieking, Clerk
By: Jean Davis, Deputy Clerk